UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jena Ferguson,<br><br>Plaintiff,<br><br>-against-<br><br>National Credit Systems, Inc.; IQ Data International, Inc.; Trans Union LLC a/k/a TransUnion; Experian Information Solutions, Inc.; Equifax Information Services LLC,<br><br>Defendants. | Civil Action<br>Case No.: 1:26-cv-08021<br><br>**COMPLAINT** |

Plaintiff Jena Ferguson ("Plaintiff"), by and through her attorneys, Petroff Amshen LLP, alleges as follows upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters:

1. Plaintiff brings this action against Trans Union LLC a/k/a TransUnion ("TransUnion"), Experian Information Solutions, Inc. ("Experian"), and Equifax Information Services LLC ("Equifax") (collectively, the "CRAs"), and National Credit Systems, Inc. ("NCS") and IQ Data International, Inc. ("IQ Data") (collectively, the "Furnishers"), arising from their willful and negligent violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.

2. Plaintiff has never lived in Georgia or North Carolina. Yet her credit reports attribute to her collection debts for two apartment leases she never signed, one of them for a North Carolina property. Plaintiff identified the debts in an FTC Identity Theft Report and a written dispute demanding that the CRAs block and remove the information. No Defendant removed them. Two months later, both collections were still on her reports, in the same amounts and the same collection status.

3. Experian processed a dispute concerning the NCS collection in August 2026 and continued to report the same $1,516.00 balance as Plaintiff's debt. Equifax and TransUnion continued to report that collection and a separate $1,453.00 apartment collection from North Carolina. Plaintiff's dispute concerned whether she had incurred either rental debt. Each CRA continued to identify her as responsible for the collection or collections it reported.

## PARTIES

4. Plaintiff is an individual resident of the State of New York, residing in New York County, and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

5. NCS is a Georgia corporation, with its principal place of business in Atlanta, Georgia, and is a "person" within the meaning of 15 U.S.C. § 1681a(b) and a furnisher of information to consumer reporting agencies as defined by and subject to the FCRA, including under 15 U.S.C. § 1681s-2.

6. IQ Data is a Washington corporation, with its principal place of business in Bothell, Washington, and is a "person" within the meaning of 15 U.S.C. § 1681a(b) and a furnisher of information to consumer reporting agencies as defined by and subject to the FCRA, including under 15 U.S.C. § 1681s-2.

7. TransUnion is a Delaware limited liability company, with its principal place of business in Chicago, Illinois, and is a "consumer reporting agency," as defined by and subject to 15 U.S.C. §§ 1681a(f) and 1681a(p).

8. Experian is an Ohio corporation, with its principal place of business in Costa Mesa, California, and is a "consumer reporting agency," as defined by and subject to 15 U.S.C. §§ 1681a(f) and 1681a(p).

9. Equifax is a Georgia limited liability company, with its principal place of business in Atlanta, Georgia, and is a "consumer reporting agency," as defined by and subject to 15 U.S.C. §§ 1681a(f) and 1681a(p).

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law.

11. This Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302, and the exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment.

12. NCS transacts business within the State of New York within the meaning of CPLR § 302(a)(1). It collects debts from New York consumers and regularly furnishes information concerning them to the national consumer reporting agencies. NCS holds an active New York City debt-collection license, and it furnished the Riverwalk collection into the consumer file of Plaintiff, a New York resident.

13. IQ Data transacts business within the State of New York within the meaning of CPLR § 302(a)(1). It collects debts from New York consumers and regularly furnishes information concerning them to the national consumer reporting agencies. IQ Data is registered to do business in New York and holds an active New York City debt-collection license, and it furnished the Enclave collection into the consumer file of Plaintiff, a New York resident.

14. Both Furnishers contacted Plaintiff concerning their respective collections, directing those communications to her in New York, where she resided throughout the relevant period. Plaintiff transmitted her dispute from New York, and each Furnisher, on notice that

Plaintiff was a New York consumer, continued to furnish information into her consumer file. Plaintiff's claims against the Furnishers arise from that New York-directed conduct.

15. TransUnion transacts business within the State of New York. It maintains consumer files on New York residents, including Plaintiff. It prepares and sells consumer reports concerning New York residents to users located in New York, including creditors, lenders, and landlords, and it prepared, sold, or disseminated consumer reports concerning Plaintiff to such users. TransUnion is registered to do business in New York as Trans Union (of Delaware), LLC and maintains a registered agent for service of process here, Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

16. Experian transacts business within the State of New York. It maintains consumer files on New York residents, including Plaintiff. It prepares and sells consumer reports concerning New York residents to users located in New York, including creditors, lenders, and landlords, and it prepared, sold, or disseminated consumer reports concerning Plaintiff to such users. Experian is registered to do business in New York and maintains a registered agent for service of process here, C T Corporation System, 28 Liberty Street, New York, New York 10005.

17. Equifax transacts business within the State of New York. It maintains consumer files on New York residents, including Plaintiff. It prepares and sells consumer reports concerning New York residents to users located in New York, including creditors, lenders, and landlords, and it prepared, sold, or disseminated consumer reports concerning Plaintiff to such users. Equifax is registered to do business in New York and maintains a registered agent for service of process here, Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

18. Plaintiff transmitted her dispute to each CRA from New York, and each CRA directed its reinvestigation and its handling of her identity-theft block request at the consumer file

of a New York resident. Plaintiff's claims against each CRA arise from that New York-directed conduct.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here, including the dissemination of and reliance on her consumer reports in this District and the harm she suffered here, where she resides.

## STATEMENT OF FACTS

20. Plaintiff is a victim of identity theft. An unknown person used Plaintiff's personal identifying information to enter into two apartment leases she never signed, one in North Carolina and one in Georgia, states in which she has never lived and in which she has never entered into any rental or lease agreement. The Defendants' own reporting dates the fraud to 2024. TransUnion reports the North Carolina apartment account as opened on August 29, 2024, and both TransUnion and Experian report the Georgia apartment account as opened on October 18, 2024. Plaintiff first discovered the resulting collection accounts in June 2026, when she reviewed her credit reports.

21. Plaintiff's July 2, 2026 credit reports from Equifax, Experian, and TransUnion each reported a collection account furnished by NCS for an alleged debt to Riverwalk Apts, Account No. 55944XXXX, with a balance of $1,516.00 (the "NCS Account").

22. Equifax and TransUnion also reported a collection account furnished by IQ Data for an alleged debt to The Enclave at Deep River in North Carolina, Account No. IQD0HXXXX, with a balance of $1,453.00 (the "IQ Data Account," and together with the NCS Account, the "Accounts").

23. Plaintiff has never lived in Georgia or North Carolina. She did not open or authorize either apartment account and received no benefit from either account. Neither collection represents a rental debt she incurred.

24. Plaintiff's residential and employment history, as the Defendants' own files reflect, is entirely a New York history. Equifax reports a rental-agreement account for Plaintiff placed by RealPage, Inc., opened June 5, 2025 and closed November 30, 2025 with a zero balance and paid as agreed. TransUnion has reported Plaintiff at her Manhattan address since January 31, 2015. Experian identifies Plaintiff's employers as the City of New York Board of Education and Knowledge Speaks Inc., both located in New York. Plaintiff's only rental-agreement account reported as anything other than a collection is one she paid in full and closed with a zero balance; the only rental obligations reported as delinquent against her are for apartments in states where she has never lived.

25. Before July 2026, Plaintiff had disputed the Accounts with each of the CRAs. TransUnion's own July 2, 2026 report corroborates those earlier disputes: it carried the remark "Account information disputed by consumer (FCRA)" on both the NCS Account and the IQ Data Account weeks before Plaintiff sent her July 2026 written dispute. She obtained a police report concerning the identity theft and sent it to Equifax, Experian, and TransUnion, and each continued to report the Accounts as her obligations.

26. Experian's own report records that it processed a dispute concerning the NCS Account in December 2025. Experian continued to report the collection as Plaintiff's obligation on July 2, 2026. That same report records that the NCS Account carried the comment "Account information disputed by consumer" during the periods December 2024 through October 2025 and January 2026 through May 2026. Experian thus had notice that Plaintiff contested the collection

for roughly nineteen months before her July 2026 written dispute, processed a dispute concerning it in December 2025, and reported it as her obligation throughout.

27. On July 6, 2026, Plaintiff completed FTC Identity Theft Report No. 203639810 (the "FTC Report"), identifying both Accounts as having been opened without her authorization.

28. Plaintiff's written dispute, dated July 17, 2026 and addressed to each CRA, identified both Accounts, stated that neither belonged to her, and informed each CRA that Plaintiff had never resided in North Carolina or Georgia and had no connection to either state. It requested that the information be blocked and removed or, alternatively, investigated and deleted if it could not be verified. The dispute package included the FTC Report, identification documents, proof of address, and the credit report showing the disputed collections.

29. Upon information and belief, each CRA received Plaintiff's dispute package.

30. Upon information and belief, the CRAs notified NCS of Plaintiff's dispute of the NCS Account, and Equifax and TransUnion notified IQ Data of her dispute of the IQ Data Account. Those notices conveyed that Plaintiff denied incurring the apartment debts and asserted identity theft.

31. On September 1, 2026, Plaintiff obtained updated consumer reports from each of the CRAs. Both Accounts remained on every report that had carried them in July, in the same amounts and in the same collection status.

32. Plaintiff learned that her dispute had been resolved against her only by purchasing her own consumer reports. No CRA provided Plaintiff with written notice of the results of its reinvestigation, a description of its reinvestigation procedure, or notice of her right to add a statement to her file. Experian's own report records that it processed her dispute in August 2026,

yet Plaintiff received no written notice of that result within five business days after the reinvestigation was completed, or at any time.

33. Experian identified August 2026 as the month in which it processed Plaintiff's dispute and reported the NCS balance as updated on August 30, 2026. After processing the dispute, Experian still reported Plaintiff as owing the same $1,516.00 rental debt she had denied incurring.

34. Equifax reported the NCS Account as unpaid with a balance of $1,516.00 as of August 30, 2026, and the IQ Data Account as unpaid with a balance of $1,453.00 as of August 22, 2026. TransUnion reported both Accounts in collection status, in the same amounts and as of the same dates.

35. The only thing that changed was the date. A refreshed reporting date does not make a false debt true, and each Account continued to attribute to Plaintiff a rental obligation she never incurred.

36. The Defendants also reported irreconcilable payment information about the NCS Account. TransUnion reported the collection with a high balance of $2,016.00 and a last payment date of October 9, 2024. Experian reported the same collection with an original balance of $2,016.00 and a payment history showing that nothing was paid on October 9, 2024. Both cannot be accurate. Plaintiff made no payment on either Account, and no Defendant reconciled the conflicting payment data it reported about the same debt.

37. Equifax reported the IQ Data Account as under reinvestigation on both reports. Its July 2, 2026 report carried the remark "Consumer Disputes - Reinvestigation in Process," and its September 1, 2026 report carried that same remark sixty-one days later, with the collection still reporting at $1,453.00.

38. Equifax never completed that reinvestigation within the time the FCRA allows. Because the reinvestigation was already in process when Equifax issued its July 2, 2026 report, Equifax had received notice of the dispute on or before that date. Section 1681i(a)(1)(A) required Equifax to complete the reinvestigation and record the current status of the disputed information, or delete the item, within thirty days of receiving that notice, and in no event later than the forty-five days permitted if the period is extended under 15 U.S.C. § 1681i(a)(1)(B). Sixty-one days later, Equifax was still reporting the IQ Data Account as under reinvestigation at the same $1,453.00 balance.

39. Equifax's reports carried Plaintiff's own consumer statement, "SOMEONE STOLE MY IDENTITY AND OPENED ACCOUNTS WITH IT," on both July 2, 2026 and September 1, 2026, while Equifax continued to report both Accounts as debts she owed.

40. Plaintiff's dispute required an inquiry into who incurred the rental obligations. She identified the apartment creditors, denied opening or authorizing the Accounts, and supplied identifying documents and the FTC Report. A reasonable investigation would have examined the records identifying the tenant responsible for each debt against the information Plaintiff supplied.

41. Upon information and belief, after receiving notice of Plaintiff's dispute from the CRAs, NCS continued to furnish the NCS Account and IQ Data continued to furnish the IQ Data Account without reasonably examining whether Plaintiff was the person responsible for the underlying rental obligation. Upon information and belief, the CRAs likewise failed to reasonably evaluate that question when reinvestigating the collections they reported.

42. Identifying an Account as disputed did not correct the false attribution of the debt. Plaintiff did not incur either rental obligation, and the CRAs continued to report the collections as debts she owed.

43. The Defendants' own reports schedule the false collections to remain in Plaintiff's credit file for years to come. TransUnion reports that the IQ Data Account will remain on file until June 2031 and the NCS Account until July 2031. Experian reports that the NCS Account will remain on record until May 2031. Absent correction, Plaintiff will carry these apartment collections for roughly five more years, and every consumer report the Defendants sell during that period will attribute them to her.

44. Experian's file on Plaintiff lists five addresses. Two are at 4558 Broadway in Manhattan, where Plaintiff resides. The other three are 12955 Biscayne Boulevard, North Miami, Florida, which Experian's own report classifies as a non-residential business address, 2109 Lincoln Drive, Arlington, Texas, and 1454 Carol Oaks Lane, Apartment 303, Fort Worth, Texas.

45. Experian identifies each of the Texas addresses as multifamily or apartment housing in the address section of its report. Elsewhere in the same report, under the heading advising that Experian's internal records classify certain addresses as non-residential business addresses, Experian lists both 12955 Biscayne Boulevard in North Miami and 2109 Lincoln Drive in Arlington, Texas, the latter under the category "Finance-Insur.-Real Est. Srvc." Experian therefore recorded the Arlington address as apartment housing and as a place of business at the same time. It also lists four variants of Plaintiff's name, including the misspelling Jena Fegurson, and three telephone numbers, none of which is the number Plaintiff uses.

46. TransUnion has maintained a file on Plaintiff since December 1, 1985. It reports a single address for her, her Manhattan residence, which it has reported since January 31, 2015, and no former address. Equifax reports that same single address and states that Plaintiff has no former addresses. Equifax also reports Plaintiff under a single name, Jena Lynn Ferguson, and states that she has no former names. Experian, by contrast, carries four name variants for the same consumer,

including the misspelling Jena Fegurson. Neither TransUnion nor Equifax associates Plaintiff with any Texas or Florida address.

47. Equifax's own file, however, carries a telephone number that is not Plaintiff's. Its July 2, 2026 report and its September 1, 2026 report each list her telephone number as (678) 463-1586, an area code assigned to metropolitan Atlanta, Georgia, and each reports no former telephone numbers. That is not Plaintiff's telephone number, and she has never lived in Georgia. The NCS Account that Equifax reported against her is a collection on an alleged Georgia apartment debt, placed by a collection agency based in Atlanta.

48. TransUnion, by contrast, reports Plaintiff's correct telephone number on both its July 2, 2026 report and its September 1, 2026 report, and reports no other telephone number for her. All three CRAs hold the same Social Security number and the same date of birth for Plaintiff. On that identical identifying information, TransUnion matched Plaintiff to her own telephone number, while Experian associated her with three telephone numbers that are not hers and Equifax associated her with a Georgia telephone number that is not hers. TransUnion also reports Plaintiff's New York employers as verified as far back as 2003.

49. Experian therefore maintained a file that merged Plaintiff's identity with apartment addresses and telephone numbers that neither TransUnion nor Equifax associated with her, and it reported the rental collections against her out of that file. Procedures that assure maximum possible accuracy do not produce that result.

50. Each of the CRAs published the inaccurate information concerning the Accounts by disclosing Plaintiff's consumer report to third parties. On December 10, 2025, while both Accounts were on file, Equifax, Experian, and TransUnion each furnished a consumer report concerning Plaintiff to Equifax Mortgage Service on behalf of Tomo Mortgage, LLC.

51. Each agency records that disclosure as a hard inquiry, and TransUnion records its permissible purpose as a credit transaction. Experian's report defines a hard inquiry as a request for a consumer's information arising from an action the consumer initiates, such as applying for credit. Tomo Mortgage, LLC obtained Plaintiff's Equifax file again on December 12, 2025 and on January 18, 2026.

52. Plaintiff pleads those disclosures to establish that the inaccurate reporting was material, that it reached an actual lender, and that the harm was already underway when the CRAs received her dispute.

53. The disclosures continued after the dispute. On August 12, 2026, Experian furnished a consumer report concerning Plaintiff to RentGrow, Inc. on behalf of Pelican Management for a stated legitimate business need, while Experian continued to report the NCS Account as a collection with $1,516.00 past due. Upon information and belief, each of the CRAs furnished consumer reports containing the disputed information to other users authorized to receive them during the same period.

54. Before her July 2026 written dispute, Plaintiff was denied a credit card because of the fraudulent collection information on her credit reports. Plaintiff's written dispute informed each CRA of that denial. Each CRA therefore knew, before it responded to her dispute, that the reporting she was challenging had already cost her access to credit.

55. By July 6, 2026, Plaintiff had spent more than twenty hours attempting to resolve the reporting of the Accounts.

56. Plaintiff suffered stress, anxiety, sleep disturbance, and embarrassment while attempting to remove apartment debts she had not incurred from her credit reports.

## CAUSES OF ACTION

### COUNT I: Willful Noncompliance With The FCRA Against The Furnishers (Violations of 15 U.S.C. § 1681s-2(b))

57. Plaintiff incorporates by reference each of the preceding paragraphs.

58. Upon receiving notice of the dispute from a CRA, each Furnisher was required to investigate the information it furnished, review the relevant information provided by the CRA, report its findings, and correct, delete, or permanently block information found inaccurate, incomplete, or unverifiable as required by 15 U.S.C. § 1681s-2(b).

59. A reasonable investigation of the disputed Accounts would have addressed whether Plaintiff incurred the underlying rental obligations. Confirming the collection balance without reasonably examining the identity of the tenant responsible for the debt would not resolve the dispute Plaintiff raised.

60. Upon information and belief, NCS failed to conduct that reasonable inquiry concerning the NCS Account, and IQ Data failed to conduct that reasonable inquiry concerning the IQ Data Account, after receiving CRA notice. Each continued to furnish its respective Account as Plaintiff's obligation.

61. Upon information and belief, each Furnisher knowingly or recklessly disregarded the documented challenge to Plaintiff's responsibility for its collection.

62. As a direct and proximate result of the willful failure of NCS and IQ Data to investigate their respective Accounts after receiving the required notice, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual or statutory damages, punitive damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681n.

**COUNT II: Negligent Noncompliance With The FCRA Against The Furnishers (Violations of 15 U.S.C. § 1681s-2(b))**

63. Plaintiff incorporates by reference each of the preceding paragraphs.

64. In the alternative to Count I, NCS and IQ Data negligently failed to comply with their duties under 15 U.S.C. § 1681s-2(b) in investigating the respective Accounts after receiving notice of Plaintiff's dispute from a CRA.

65. Upon information and belief, each Furnisher failed to exercise reasonable care in investigating Plaintiff's ownership dispute after receiving notice from a CRA. A reasonable investigation would have assessed the information received from the CRA against records capable of identifying the person who incurred the rental debt.

66. As a direct and proximate result of the negligent failure of NCS and IQ Data to investigate their respective Accounts after receiving the required notice, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681o.

**COUNT III: Willful Noncompliance With The FCRA Against The CRAs (Failure to Conduct Reasonable Reinvestigation - Violation of 15 U.S.C. § 1681i)**

67. Plaintiff incorporates by reference each of the preceding paragraphs.

68. Receipt of Plaintiff's dispute required each CRA to reasonably reinvestigate the challenged information, review and consider all relevant information she supplied, and correct or delete information found inaccurate, incomplete, or unverifiable, within the time allowed by 15 U.S.C. § 1681i(a)(1)(A), and as required by 15 U.S.C. § 1681i(a)(4), and to provide Plaintiff written notice of the results of its reinvestigation within five business days of completing it, including a description of its reinvestigation procedure and notice of her right to add a statement to her file, as required by 15 U.S.C. § 1681i(a)(6).

69. The FTC Report and Plaintiff's identifying documents accompanied a specific denial that she had opened or authorized either apartment account. Upon information and belief, Experian failed to reasonably evaluate that denial concerning the NCS Account, and Equifax and TransUnion failed to reasonably evaluate it concerning both Accounts. Each continued to report the collection information as Plaintiff's obligation.

70. Experian continued to report the NCS Account after its recorded August 2026 dispute processing. Equifax and TransUnion likewise continued to report both Accounts. The dispute notations accompanying the collections did not correct their attribution to Plaintiff.

71. Upon information and belief, each CRA knowingly or recklessly failed to conduct the required reinvestigation of Plaintiff's documented identity-theft dispute.

72. Each CRA also failed to provide Plaintiff the written notice of reinvestigation results required by 15 U.S.C. § 1681i(a)(6). Upon information and belief, each CRA knowingly or recklessly withheld that notice, leaving Plaintiff to learn the outcome of her dispute only by purchasing her own consumer reports.

73. Equifax further failed to complete its reinvestigation of the IQ Data Account within the period allowed by 15 U.S.C. § 1681i(a)(1)(A), or within the extended period permitted by 15 U.S.C. § 1681i(a)(1)(B). Its own reports show the reinvestigation open and the collection reporting unchanged sixty-one days apart. Upon information and belief, Equifax knowingly or recklessly allowed the statutory period to lapse while continuing to report the collection as Plaintiff's obligation.

74. Plaintiff disputed collection accounts for out-of-state apartments. Experian's own file carried three out-of-state addresses for Plaintiff, two of them apartment addresses, that no other

national agency associated with her. A reasonable reinvestigation would have examined that information, which Experian already held.

75. As a direct and proximate result of the willful failure of the CRAs to reinvestigate the disputed information after receiving the required notice, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual or statutory damages, punitive damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681n.

**COUNT IV: Negligent Noncompliance With The FCRA Against The CRAs**
**(Failure to Conduct Reasonable Reinvestigation - Violation of 15 U.S.C. § 1681i)**

76. Plaintiff incorporates by reference each of the preceding paragraphs.

77. In the alternative to Count III, Experian negligently failed to comply with its reinvestigation duties under 15 U.S.C. § 1681i(a) concerning the NCS Account, and Equifax and TransUnion negligently failed to comply with those duties concerning both Accounts.

78. Upon information and belief, each CRA failed to exercise reasonable care in reinvestigating Plaintiff's ownership dispute and evaluating the identity-theft information she supplied.

79. Each CRA also negligently failed to provide Plaintiff the written notice of reinvestigation results required by 15 U.S.C. § 1681i(a)(6).

80. Equifax also negligently failed to complete its reinvestigation of the IQ Data Account within the period allowed by 15 U.S.C. § 1681i(a)(1)(A), or within the extended period permitted by 15 U.S.C. § 1681i(a)(1)(B).

81. Experian likewise negligently failed to examine the out-of-state apartment addresses its own file carried for Plaintiff when reinvestigating her dispute of the out-of-state apartment collections.

82. As a direct and proximate result of the negligent failure of the CRAs to reinvestigate the disputed information after receiving the required notice, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681o.

**COUNT V: Willful Noncompliance With The FCRA Against The CRAs**
**(Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy - Violation of 15 U.S.C. § 1681e(b))**

83. Plaintiff incorporates by reference each of the preceding paragraphs.

84. When preparing consumer reports, each CRA was required to follow reasonable procedures to assure maximum possible accuracy.

85. The collection information was false because Plaintiff did not incur either apartment debt. Upon information and belief, Experian prepared and supplied consumer reports attributing the NCS Account to Plaintiff, and Equifax and TransUnion prepared and supplied consumer reports attributing both Accounts to Plaintiff, without reasonable procedures to determine whether she was the person who incurred the debts.

86. Upon information and belief, each CRA knowingly or recklessly disregarded the risk of attributing another person's debt to Plaintiff, including by continuing to treat the challenged collection information as hers after her documented ownership dispute.

87. Experian assembled and maintained Plaintiff's file with four name variants, three telephone numbers other than the one Plaintiff uses, and three out-of-state addresses that neither TransUnion nor Equifax associated with her. Upon information and belief, Experian then reported the rental collections against Plaintiff without reasonable procedures to determine whether that file described one person.

88. Equifax likewise assembled and maintained Plaintiff's file with a metropolitan Atlanta telephone number that is not hers, while reporting against her a collection on an alleged

Georgia apartment debt. Upon information and belief, Equifax reported that collection without reasonable procedures to determine whether the Georgia contact information in its file and the New York consumer it identified as Plaintiff described the same person.

89. Independent of who incurred the underlying debt, TransUnion and Experian reported mutually inconsistent payment information about the NCS Account, one showing a payment made on October 9, 2024 and the other showing that nothing was paid on that date. Upon information and belief, each reported that information without reasonable procedures to assure its accuracy, and each knowingly or recklessly disregarded the conflict.

90. As a result, Plaintiff suffered injury to her credit reputation, a credit-card denial, emotional distress, and time lost addressing the false reporting. Plaintiff seeks actual or statutory damages, punitive damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681n.

**COUNT VI: Negligent Noncompliance With The FCRA Against The CRAs (Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy - Violation of 15 U.S.C. § 1681e(b))**

91. Plaintiff incorporates by reference each of the preceding paragraphs.

92. In the alternative to Count V, Experian negligently failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. § 1681e(b) in preparing reports containing the NCS Account. Equifax and TransUnion negligently failed to follow such procedures in preparing reports containing both Accounts.

93. Upon information and belief, each CRA failed to exercise reasonable care in determining whether the collection information it included in consumer reports concerned obligations Plaintiff actually incurred.

94. Experian likewise negligently failed to follow reasonable procedures in assembling and maintaining a file for Plaintiff that merged her identity with name variants, telephone numbers, and out-of-state apartment addresses that neither TransUnion nor Equifax associated with her.

95. Equifax likewise negligently failed to follow reasonable procedures in assembling and maintaining a file for Plaintiff that paired her New York identity with a metropolitan Atlanta telephone number that is not hers, and in reporting a Georgia apartment collection against that file.

96. TransUnion and Experian likewise negligently failed to follow reasonable procedures to assure the accuracy of the payment information they reported about the NCS Account, which cannot both be correct.

97. As a result, Plaintiff suffered injury to her credit reputation, a credit-card denial, emotional distress, and time lost addressing the false reporting. Plaintiff seeks actual damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681o.

**COUNT VII: Willful Noncompliance With The FCRA Against The CRAs**
**(Failure to Block Identity Theft Information - Violation of 15 U.S.C. § 1681c-2)**

98. Plaintiff incorporates by reference each of the preceding paragraphs.

99. Plaintiff's submission supplied proof of identity, the FTC Report, identification of the information to be blocked, and her statement that the information did not relate to a transaction she made or authorized. Upon receipt of those materials, each CRA was required to block the identified information within four business days under 15 U.S.C. § 1681c-2(a), and to promptly notify the furnisher of that information that it may be a product of identity theft, that an identity theft report had been filed, that a block had been requested, and of the effective dates of the block, as required by 15 U.S.C. § 1681c-2(b).

100. Upon information and belief, Experian failed to block the NCS Account, and Equifax and TransUnion failed to block both Accounts, within that period. The Accounts remained attributed to Plaintiff in the September credit reports.

101. Upon information and belief, no CRA notified NCS or IQ Data that the collection information it furnished may be a product of identity theft, that Plaintiff had filed an identity theft

report, that a block had been requested, or of any effective dates of a block, as 15 U.S.C. § 1681c-2(b) requires. Had those notifications issued, each Furnisher would have been on notice of the identity-theft claim independent of the dispute notices described above.

102. Upon information and belief, each CRA knowingly or recklessly failed to honor Plaintiff's qualifying identity-theft block request.

103. As a direct and proximate result of the willful failure of the CRAs to block the identified collection information after receiving Plaintiff's qualifying submission, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual or statutory damages, punitive damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681n.

**COUNT VIII: Negligent Noncompliance With The FCRA Against The CRAs**
**(Failure to Block Identity Theft Information - Violation of 15 U.S.C. § 1681c-2)**

104. Plaintiff incorporates by reference each of the preceding paragraphs.

105. In the alternative to Count VII, Experian negligently failed to comply with its duties under 15 U.S.C. § 1681c-2 concerning the NCS Account, and Equifax and TransUnion negligently failed to comply with those duties concerning both Accounts.

106. Upon information and belief, each CRA negligently failed to block the identified collection information after receiving Plaintiff's qualifying identity-theft submission, and negligently failed to provide the furnisher notifications required by 15 U.S.C. § 1681c-2(b).

107. As a direct and proximate result of the negligent failure of the CRAs to block the identified collection information after receiving Plaintiff's qualifying submission, Plaintiff expended further time and effort seeking correction of the reporting. Plaintiff seeks actual damages, costs, and reasonable attorneys' fees under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against each Defendant on the counts alleged against it, awarding the following:

I. Actual damages in an amount to be determined at trial, including damage to creditworthiness and reputation, lost time, and emotional distress, pursuant to 15 U.S.C. §§ 1681n(a)(1)(A) and 1681o(a)(1);

II. In the alternative to actual damages on claims for willful noncompliance, statutory damages as permitted by 15 U.S.C. § 1681n(a)(1)(A);

III. Punitive damages against each Defendant in an amount to be determined at trial, as allowed under 15 U.S.C. § 1681n(a)(2), for its willful and reckless violations of the FCRA;

IV. Reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2);

V. Pre-judgment and post-judgment interest as allowed by law; and

VI. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a trial by jury on all issues so triable.

Dated: Brooklyn, New York
September 15, 2026

**PETROFF AMSHEN LLP**
*Attorneys for Plaintiff,*
Jena Ferguson

*/s/ Serge F. Petroff*
Serge F. Petroff, Esq.
1795 Coney Island Avenue, Third Floor
Brooklyn, New York 11230
Telephone: (718) 336-4200
Email: spetroff@petroffamshen.com